**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*,<br>v.<br>FAHKIR JOHNSON<br>*Defendant*. | Crim No. 24-782 (KSH)<br><br>**OPINION** |

**Katharine S. Hayden, U.S.D.J.**

Fahkir Johnson, who has been indicted on the charge of possession of a firearm by a convicted felon, has moved to suppress the evidence against him.

## I. Background

Fahkir Johnson and three companions were in a parked car near his residence in Vailsburg on a sunny September afternoon when two uniformed police officers approached and ordered them out. The officers had been alerted by Detective Christopher Serrano of the Violent Crimes Task Force of the Newark Police Department, who had been parked in an unmarked car further down the street. After the responding police ordered the occupants out of the car, Officer Lucas Borges patted down Samaj Collins, who had been in the backseat on the driver's side. He recovered glassine envelopes containing suspected drugs (later confirmed to be heroin) from Collins's shorts pocket. After the car occupants were restrained, one of the arresting officers located a gun on the floor of the front passenger seat where Fahkir Johnson had been sitting. Police continued to search the car without finding any other contraband. They searched Samaj Collins again and recovered a gun hidden in his compression shorts. So: two guns.

This was not unexpected. Detective Serrano had been canvassing the neighborhood because an hour and 23 minutes earlier, when he was at the police station, a live video popped up on his cell phone from Fahkir Johnson's Instagram account. To the amusement of his friends, Johnson was smoking a joint and waving a gun around and panning down to another one on his lap.

Both Collins and Johnson had prior convictions, which meant the police were watching Johnson posting himself in the commission of a crime.










The Newark task force had kept tabs on Johnson; hence his account was available to Detective Serrano and anyone who knew his tag. Based on the guns and drugs recovered that afternoon, Johnson and Collins were indicted together. Johnson was charged with one count of gun possession by a convicted felon. He has moved to suppress all evidence recovered from the

traffic stop on the grounds that the police did not have reasonable suspicion to apprehend the occupants of the car.[1]

## II. Evidentiary Hearing

The Court held an evidentiary hearing at which Detective Serrano testified and clips[2] of the Instagram live videos were admitted into evidence. (D.E. 94, T23:6-10 & Exs. C-1 and C-2, Instagram Live Videos.) Both sides filed pre- and post-hearing briefs (D.E. 81, 82, 95, 96). Detective Serrano is a member of the Violent Crimes Task Force of the Newark Police Department also on loan to the federal Bureau of Alcohol, Tobacco and Firearms. The task force focuses on known violent offenders, "us[ing] real time information to prevent future acts of violence within [Newark]." (D.E. 94, 2/4/26 Evidentiary Hearing Transcript ("T"), at T12:6-12.) Investigations by the two agencies overlap and they share resources.

On September 6, 2023, a Wednesday, Detective Serrano returned from a normal shift and, as was his practice, monitored public forums and Instagram accounts for information on criminal activity in Newark. (T16:11-14.) "[Y]ou are just scrolling through the feed . . ." (T17:17-21.) As he described it, "Typically, [Instagram] depicts anybody that you follow . . . [and] show[s] images of those individuals. And if they recently post a new post or have a live video that immediately jumps to the front of the notifications." (T16:21-25.) Fahkir Johnson was posting a live video on his Instagram account. (T18:3-19:22.)

---

[1] Collins, who was charged with gun possession and the drug offense, has since pled guilty and been sentenced. His unsuccessful motion to suppress the evidence against him was brought on different grounds.

[2] At the evidentiary hearing on Collins's suppression motion, the government introduced the full Instagram video. It elected to play two selected clips at Johnson's hearing.

Detective Serrano had not personally interacted with Johnson but knew that he had previously been arrested in Newark. (T18:12-23.) The tag for the user name on the account was "Dillz," Johnson's street name. (T18:19-23.) Additionally there were multiple pictures and videos depicting Johnson. (T18:21-23.) Various markings on the feed showed Detective Serrano he was viewing a live posting. (T19:4-22.)

After they reviewed the live Instagram video, the police "began a canvass" for the car and for Johnson. (T24:22-25.) Detective Serrano went to Johnson's last known address in the Vailsburg section of Newark. (T25:2-17.) "I saw a sedan parked head out at the end of a dead end, blocking a driveway. . . . I noticed there was Vailsburg Park directly behind the car with multiple trees and there was smoke coming out of the windows of the car." (T25:9-13.) From where Detective Serrano was parked, he wasn't able to see for certain that Johnson was inside the sedan, so he maintained surveillance while he called for additional police officers to make a motor vehicle stop. (T25:20-24.) He intentionally called for officers in the area who were uniformed and in marked cars so that the occupants of the sedan knew that law enforcement was approaching them. (T26:3-12.) The uniform officers were wearing body cameras, the footage from which the government introduced. (T26:13-28:10.)

The police conducted a traffic stop. They removed and patted down the four occupants. (T28:21-29:10.) No contraband was found on Johnson's person. (T29:6-9.) "Arrest[s] happened after that." (T29:11-12.)

Detective Serrano testified that one of the uniformed officers he had called for assistance confirmed, as he approached the sedan, that Fahkir Johnson was the front seat passenger. (T28:14-21.) The arresting officers' body camera footage showed them approaching the car and removing and patting down the four occupants. (T29:21-8, 31:19-32:5 & Ex. B, Officer Lucas

Borges Body Worn Camera Footage ("Borges BWC"), at 0:35 to 0:57.) Officer Borges located glassine envelopes in Collins's shorts pocket. (T32:4-34:1 & Ex. B, Borges BWC, at 0:49 to 0:57.) From a distance, Detective Serrano observed the Borges/Collins encounter. (T33:12-15.) Further body camera footage showed another officer on the scene, Detective Rivera, shine a flashlight into the interior of the sedan and someone on the scene can be heard saying, "There is a gun." (T35:24-37:14 & Ex. E, Officer Vincent Kalra Body Worn Camera Footage, at 3:47 to 3:50.) It was under the car seat that Johnson was sitting in. (T37:2-39:19.) The government introduced still photos of the gun and its location. (T39:7-40:8 & Exs. G-1 and G-2.)

Detective Serrano's incident report records that one hour and 23 minutes elapsed between the time he saw Johnson's live Instagram and when he arrived at the scene of the arrest. (T41:24-42:10.) "It took a little bit to mobilize everything to get in the [surveillance] vehicle to get to the area and to canvass for him." (T42:16-18.)

Cross examination elicited that the sedan was blocking a few feet of the driveway. (T48:3-52:10.) (The incident report describes the car as "partially blocking the driveway" (T64:9-17).) The Instagram live videos didn't show the exterior of the car Johnson was in (T48:21-50:1, 53:19-55:3); the body cam footage from the arresting officers didn't show smoke coming out of the sedan (T52:11-53:18, 55:20-56:16); the officers approached the sedan not to give a traffic ticket but because Detective Serrano believed Johnson was in it (T56:17-24); Detective Serrano didn't see the gun in plain view, instead, the officer who saw it told him that is where it was (T56:25-60:9); at the time the gun was located, there were no threats to officer safety because all occupants were detained and handcuffed (T60:10-61:9); and Collins was belatedly discovered to have a loaded gun inside his pants after he had been secured inside a police vehicle (T60:21-61:9). The police didn't apply for a warrant to search the car; instead an

officer used a flashlight and searched. (T61:10-23.) The car was never impounded. (T61:24-25.)

Johnson argues Detective Serrano's testimony confirms the arresting officers lacked reasonable suspicion to stop the car Johnson was in, particularly focusing on his testimony that he "could not match the interior of the vehicle seen in the Instagram video with the exterior of the vehicle that was stopped." (D.E. 96, Post-Hearing Br., at 2.) This testimony, Johnson argues, "directly contradicts Detective Serrano's incident report, which stated: 'At approximately 14:40 hours I observed a vehicle matching the description of the vehicle from the video.'" (*Id.*) Johnson cites to an exchange between defense counsel and Detective Serrano:

> Q: Tell the court how you could possibly match the exterior of a vehicle with an interior of a vehicle?
>
> A: Well, I can't.
>
> (*Id.* (quoting T49:5-7).)

Johnson buttresses his argument with body cam footage that does not depict smoke coming out of the sedan and the omission of any mention of smoke in the incident report. (*Id.* at 3-4.) "Either the smoke cleared within moments of the officers approaching the vehicle or Detective Serrano concocted this observation in real time at the hearing to substantiate the stop. Defense counsel submits the latter is likely true." (*Id.*)

Further, Johnson argues, no tickets were issued in connection with the blocked driveway, only a couple of feet of which were blocked by the sedan. (T50:20-51:15, 52:3-10.) Detective Serrano confirmed the primary reason police responded to the location was to "apprehend [Fahkir] Johnson because of what was going on in the Instagram live video." (T50:20-23.) Johnson contends this is an admission that, coupled with his argument that the sedan "was barely encroaching on the driveway . . . [t]he ingress and egress of the driveway itself was not affected,"

(DE 96, Post-Hearing Br., at 5), reveals that the stop was not based on reasonable suspicion and Detective Serrano knew it. (*Id.*)

Johnson's other argument is that the government failed to establish the gun recovered from the sedan was in plain view. He targets Detective Serrano's testimony as fatally undermining that justification when he said "he had no personal knowledge about whether the firearm was in 'plain view' when it was discovered." (*Id.*) From the testimony:

> Q: So your entire testimony about this concept in plain view and a firearm being able to be seen by Detective Rivera, you don't have any independent knowledge of that. You are basing it on what Detective Rivera said. Correct?
>
> A: Correct.
>
> (T60:4-9.)

Johnson points out that Detective Serrano testified Detective Rivera used a flashlight even though it was broad daylight. (D.E. 96, Post-Hearing Br., at 6.) Because police didn't impound the sedan or get a search warrant despite there being no immediate concerns about safety or destruction of evidence, and because the testimony suggested that Detective Rivera leaned into the sedan in connection while shining the flashlight into it, Johnson argues the firearm was not immediately apparent and the police activity "crosses the threshold from plain view to a search" inside the vehicle, rather than plain view from outside. (*Id.* at 6-7.) Johnson characterizes the government's decision not to call Detective Rivera as creating an adverse inference. (*Id.* at 7.)

Finally, Johnson points to Detective Serrano's admissions about his unfamiliarity with the workings of Instagram as establishing he "could not verify who actually created or controlled" the Instagram account that went live and led to the police activity. (*Id.* at 8.) "The Instagram

video, viewed an hour and twenty-three minutes before the stop, did not provide reliable probable cause to search the vehicle." (*Id.* at 8-9.)

## III. Discussion

In evidence are clips from the Instagram video that came live on Detective Serrano's phone depicting: Johnson smoking and pointing a gun with a red laser, then panning to other individuals and back to his lap, where he had a second gun. Johnson has not challenged the government's use of the Instagram live video as an investigative tool, nor has he disputed that officers were searching for him because of the Instagram live videos.

In its pre- and post-hearing briefing, the government justifies recovery of the gun on several grounds: first, that reasonable suspicion justified the stop based on the traffic violation and officers' subsequent identification of Johnson in the car, next, that probable cause justified the search of the car and Johnson's arrest based on the information known to officers from the Instagram live videos, and third, that the discovery of narcotics on Collins gave officers new probable cause to search the car. (D.E. 81, Pre-Hearing Opp., at 6-12; D.E. 95, Post-Hearing Opp., at 3-5.)

Under the Fourth Amendment, a police officer whose "'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.'" *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)). The reasonable suspicion standard set forth in *Terry v. Ohio*, 392 U.S. 1 (1968) applies to routine traffic stops. *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006). That is, to assess whether a traffic stop was reasonable, courts must consider the totality

of the circumstances, including the officer's perspective[3] and whether "specific, articulable facts produced by the officer would support reasonable suspicion of a traffic infraction" or a "reasonable, articulable suspicion that criminal activity is afoot." *Id.* at 396, 398. Officers may order passengers out of the car during a traffic stop. *United States v. Moorefield*, 111 F.3d 10, 11-12 (3d Cir. 1997).

Further, "if there is 'probable cause to believe that the vehicle contains evidence of a crime'" the automobile exception to the Fourth Amendment "permits vehicle searches without a warrant." *United States v. Donahue*, 764 F.3d 293, 299-300 (3d Cir. 2014) (quoting *United States v. Salmon*, 944 F.2d 1106, 1123 (3d Cir. 1991)). Probable cause requires a "fair probability that contraband or evidence of a crime" will be found in the place to be searched. *Id.* at 301 (quoting *Illinois v. Gates*, 462 U.S. 213, 283 (1983)).

The Court easily finds that based on the Instagram live videos, officers reasonably believed that Johnson was illegally in possession of two guns when, approximately an hour and a half later, they recognized him as one of the occupants of a parked sedan. To Johnson's argument that the passage of time has significance, the Court asks: were the police to conclude he changed sedans? And if he (very unlikely) did, was he in any less possession of weapons and the public at large in any less at risk, given his gleeful affect? And as the government points out,

---

[3] The information reasonably known to the officer is relevant in judging his perspective, while the officer's subjective intentions or actual motivations for making the stop is irrelevant. *Id.* at 398 (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). Courts have recognized that a "technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006)); *see Whren*, 517 U.S. at 813 (finding that the constitutional reasonableness of traffic stops does not depend on the motivations of the officers). And officers may rely on the observations of their fellow officers in assessing the risk that a person is armed and dangerous. *United States v. Calloway*, 571 F. App'x 131, 136 (3d Cir. 2014).

the police also had a separate basis to stop the car he was in because it was partially blocking a driveway. “[A] technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime.” *Lewis*, 672 F.3d at 237. On that basis, stopping the car was supported by reasonable suspicion, and directing the occupants to get out was legally authorized.

Officers found narcotics on Collins providing an independent basis to search the car. *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) (evidence obtained through a valid search is admissible). To the extent Johnson takes apart the recovery of the gun on the floor of the front seat he had been sitting in, challenging the veracity of plain view and complaining the government should have produced Detective Rivera, these points fail because there was every reason to search the car based on what Collins had in his shorts -- and to keep searching for the second gun after fruitless patdown searches failed to turn it up because of what the Instagram video showed.

In his briefing, Johnson ignores that the Instagram videos gave police probative, contemporaneous evidence that he was in the illegal, potentially dangerous possession of two guns in a parked car. That the police who responded to the scene kept searching for the second gun supports the reason they were there -- they knew from live video that at least one convicted felon was fooling around with two guns. The defense has built its argument around a lack of reasonable suspicion because Detective Serrano, the acknowledged architect of the police stop, couldn’t say for sure that he knew from the outside that the parked car was the same car depicted in the video. The totality of the circumstances fully supports their suspicion that it was, just as Detective Serrano testified. (T47:13-48:4, 49:18-50:1, 56:11-24.) And when one of the approaching uniformed officers confirmed Johnson was inside the car, law enforcement gained a

whole new layer of authority to apprehend and search the car and the occupants based on, as this opinion has referenced time and again, what Johnson posted.

Police surveillance of live social media of this kind permits a rapid and focused response:[4] here, police knew whom they were looking for, knew he was armed, saw his intentional horseplay with the weapons in his possession, all thanks to the boastful posting Johnson shared. Within the reasonable time it took to canvass the area and summon police backup, they found him sitting with others in a smoke filled[5] sedan as depicted in the Instagram, parked in a similar setting. Johnson's motion to suppress the evidence against him for lack of reasonable cause to stop the car and search it—assuming for the moment there actually was a search—may be denied on a variety of grounds. The practical and overarching ground was provided by Johnson himself when he posted on his Instagram account, and defeats his motion.

**IV. Conclusion**

Johnson's motion to suppress (D.E. 72) is denied. An appropriate order accompanies this opinion.

Dated: July 28, 2026

*<u>/s/ Katharine S. Hayden</u>*
Katharine S. Hayden, U.S.D.J.

---

[4] *See L. Enf't & Tech.: Using Social Media*, Cong. Rsch. Serv., at 2 (Jan. 11, 2022), https://www.congress.gov/crs_external_products/R/PDF/R47008/R47008.2.pdf (describing the different ways in which police investigations utilize social media and noting how "social media provides degrees of speed and reach unmatched by many other forms of communication law enforcement uses to connect with the community").

[5] The Court finds Detective Serrano's testimony that smoke was visible at the time the police approached was credible, especially since it is difficult to accept that Johnson and his friends, wreathed in smoke in the video, moved to a smoke-free car between his posting and the arrival of the police.